UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SIMEON NILES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | CIVIL ACTION |
| TOWN OF WAKEFIELD and | ) | NO. 13-13086-JGD |
| STEVEN SKORY, KENNETH SILVA, | ) | |
| JOHN WHALEY and SCOTT REBOULET, | ) | |
| all in their individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF DECISION AND ORDER
## ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

March 24, 2016

DEIN, U.S.M.J

### I.  INTRODUCTION

The plaintiff, Simeon Niles, has brought this action against the Town of Wakefield and

various members of the Wakefield Police Department in their individual capacities.  It arises out

of an incident that occurred on April 21, 2012, when the police responded to a report of an

armed robbery in the vicinity of where the plaintiff was walking.  The plaintiff was restrained at

gunpoint, ordered to the ground, frisked, handcuffed, and brought to the site of the robbery.

When the victims informed the police that Mr. Niles was not involved in the robbery, he was

released.  The plaintiff contends, however, that there was no basis to stop him at all, and that

the actions of the police officers caused him significant physical injuries and emotional distress.

Mr. Niles has asserted claims, pursuant to 42 U.S.C. § 1983, alleging that the individual police

officers violated his Fourth and Fourteenth Amendment rights.  (Count One).  He further alleges

that the officers are liable for assault and battery (Count Two), and false imprisonment (Count

Three).  Finally, he has alleged a claim of negligence against the Town of Wakefield.  (Count

Four).

This matter is presently before the court on the defendants' motion for summary

judgment.  (Docket No. 33).  The defendants contend that they are entitled to judgment on all

counts of the complaint brought against them on the grounds that the plaintiff has failed to

state a cause of action and the individual police officers are entitled to qualified immunity.  For

all the reasons detailed herein, the defendants' motion for summary judgment is ALLOWED IN

PART and DENIED IN PART.  Summary judgment shall enter in favor of defendants Skory, Silva

and Reboulet on Count Two (assault and battery) and in favor of the Town on Count Four

(negligence).  The motion for summary judgment is otherwise denied.[1]

---

[1] The defendants have also moved to strike the affidavit submitted by the plaintiff in connection with his opposition to the motion for summary judgment on the grounds that it is a "sham affidavit" which purports to create disputed facts that contradict his deposition testimony.  See Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994).  The motion (Docket No. 48) is DENIED.  As an initial matter, some of the challenged statements are not material.  More importantly, this court does not find the affidavit to clearly contradict Mr. Niles' deposition testimony, and accepts the plaintiff's explana- tions for any inconsistencies.  (See Docket No. 49-1).  Therefore the affidavit will not be stricken.  See Hofer v. Gap, Inc., 516 F. Supp. 2d 161, 169 (D. Mass. 2007) (explaining that "the affidavit should be stricken only if there is a clear and unambiguous contradiction between the affidavit and the prior sworn testimony").

## II.  <u>STATEMENT OF FACTS</u>[2]

In ruling on a motion for summary judgment, the facts must be viewed in the light most favorable to the non-moving party, which in this case is the plaintiff.  <u>See</u> <u>Vineberg v. Bissonnette</u>, 548 F.3d 50, 56 (1st Cir. 2008).  Applying this principle, the relevant facts are as follows.

At approximately 8:30 p.m. on April 21, 2012, a radio broadcast from the Wakefield Police Department went out to all units for an armed robbery at the Dunkin Donuts at 518 Salem Street in Wakefield, Massachusetts.  It was reported that the suspect had a handgun and was threatening to shoot people.  (DF ¶ 1).  No other description of the assailant was given. Patrolman Whaley, Detective Silva, Lieutenant Skory and Lieutenant Reboulet all responded to the Dunkin Donuts location to investigate the armed robbery.  (DF ¶ 2).  Lieutenant Skory, the patrol supervisor, was first on the scene and he looked into the windows from the outside to see what was happening inside.  (DF ¶ 3).  He was followed soon thereafter by Lieutenant Reboulet, who also looked into the windows to see if the robbery was still in progress.  (DF ¶ 4). It was not.

While he was standing outside the Dunkin Donuts, Lieutenant Skory observed a black male walking west on Salem Street approximately 50 yards from his location.  According to Lieutenant Skory, this male was wearing a gray flannel jacket and a hat, and Lieutenant Skory

---

[2]  Unless otherwise indicated, the facts are derived from the following materials: Defendants' Statement of Undisputed Material Facts (Docket No. 35) ("DF"), and the exhibits attached thereto ("Def. Ex. ___"); the Affidavit of Steven Skory (Docket No. 35-1) ("Skory Aff."); the Affidavit of Scott Reboulet (Docket No. 35-3) ("Reboulet Aff."); the Affidavit of Kenneth Silva (Docket No. 35-4) ("Silva Aff."); the Affidavit of John Whaley (Docket No. 35-5) ("Whaley Aff."); Plaintiff's Response to Defendants' Statement of Undisputed Material Facts (Docket No. 43) ("PR"), and the exhibits attached thereto ("Pl. Ex. ___"); and the Affidavit of Simeon Niles (Docket No. 44-1) ("Niles Aff.").

contends that the man kept looking back at him.  (DF ¶ 5).  Lieutenant Reboulet also contends that he observed this man, and perceived that he was walking away from the Dunkin Donuts store.  (DF ¶ 6).  He further asserts that he regarded this individual as a concern since there were no other people around and the suspect in the robbery was reported to have a firearm. (Id.).  The Officers do not report noticing any other suspicious behavior.

There is no dispute that at the time of these events, the plaintiff was walking in the area where the Dunkin Donuts was located.  According to the plaintiff, he was wearing a black and gray checkered shirt and was not wearing a hat.  (PR ¶¶ 5-6).  He denies looking back at any officer and further asserts that there were a number of people in the vicinity.  (Id.).  He further denies walking away from the Dunkin Donuts, but states that he walked past the Dunkin Donuts on his way to a neighboring Irving Gas Station.  (PR ¶ 6).

Lieutenant Skory advised the other units that there was an individual leaving the immediate area of the crime scene, and requested that someone stop the male party.  (DF ¶ 7). At the time he made this request, Lieutenant Skory had received no description of the assailant from any source.  Lieutenant Reboulet was aware that Lieutenant Skory had made the broadcast.  (See Reboulet Aff. ¶ 8).

The employees at the Dunkin Donuts had fled, but two customers had locked them-selves in the bathroom.  (DF ¶¶ 8, 11).  Once inside the Dunkin Donuts, Lieutenants Skory and Reboulet proceeded to the women's bathroom and identified themselves.  (DF ¶ 9).  The two women had witnessed the armed robbery and were very distraught.  (DF ¶ 10).  The witnesses described the suspect as wearing black baggy pants and a gray jacket with a hat.  (DF ¶ 11). They did not know if the suspect was black or white because he had something over his face.

(Id.).  In response to questioning, they stated that the jacket could have been gray flannel.  (Id.).  There is no evidence in the record as to whether the witnesses were asked the age of the assailant.  It is undisputed that Mr. Niles was 66 at the time of the incident.

Detective Silva was in the area in his patrol car and had heard Lieutenant Skory's broadcast about the suspect.  (DF ¶ 12).  He exited his cruiser with his patrol rifle and walked towards the Irving Gas Station, which is within yards of the Dunkin Donuts.  (DF ¶¶ 12, 13).  He looked inside the store at the gas station and saw a black male wearing what he believed was a black and gray checkered type jacket at the register, with his back towards the window.  (DF ¶ 14).  The plaintiff argues that he was not wearing a jacket, but was wearing a black and gray checkered shirt.  (PR ¶ 14).  It is undisputed that the plaintiff was the individual that Lieutenant Skory had seen walking down the street.  (DF ¶ 15).  According to the store's video, Mr. Niles had entered the store of the gas station at 8:39:27 PM.  (DF ¶ 16).

Detective Silva notified dispatch that he had the individual inside the Irving store and he went in with his patrol rifle.  (DF ¶ 17).  He entered at 8:40:51 PM.  (DF ¶ 19).  There were several customers, as well as gas station attendants, inside the store.  (DF ¶ 18).  Customers had been coming in and out of the store on a regular basis.  (PR ¶ 6).  However, the video indicates that at the time Detective Silva entered, no one can be seen wearing a solid gray shirt or jacket.  (Def. Ex. G (video of the incident)).  Mr. Niles was at the counter and appears to have been purchasing a lottery ticket from the store employee.  (Def. Ex. G; Whaley Aff. ¶ 23).  On the video, he appears to be calm and engaged in routine business.  Detective Silva initially pointed his rifle at the floor in front of Mr. Niles and ordered him to the ground.  (DF ¶ 20; PF ¶ 20; Def. Ex. G).  He then pointed the gun directly at Mr. Niles and ordered him to the ground again.

(Def. Ex. G).  Officer John Whaley entered the store to provide backup for Detective Silva.  (DF ¶¶ 21, 22).  Detective Silva contends that he and Officer Whaley needed to instruct the plaintiff to get on the ground several times, and the plaintiff admits that he did not initially know that the order was directed at him.  (DF ¶¶ 23, 25-27; PR ¶ 24).  Nevertheless, the video (which does not have sound) indicates that the plaintiff obeyed the order within seconds and went down on the ground, first squatting, then kneeling, then extending his arms to lie on his stomach on the floor.  (Def. Ex. G; PR ¶¶ 23, 25).  Detective Silva and Officer Whaley contend that they continued to order the plaintiff to the ground because they had safety concerns, since it had been reported that the suspect in the robbery was carrying a handgun.  (DF ¶ 27).  It is undisputed that Mr. Niles did not have a weapon and was not displaying any weapon at the counter when the police entered the store.  According to the video, as noted above, Detective Silva entered the store at 8:40:51 PM.  (DF ¶ 19).  By 8:40:59 PM, Mr. Niles was down on the ground.  (PR ¶ 28; Def. Ex. G).

Detective Silva kept his gun out while Officer Whaley holstered his firearm.  (DF ¶ 29).  Officer Whaley put his knee on the small of the plaintiff's back and pulled Mr. Niles' right arm behind him.  (DF ¶¶ 29, 32; PR ¶¶ 29, 32).  The plaintiff claims that it felt like the officer's full weight was placed on his back, and he felt stiffness, burning and numbness in his back and lower extremities.  (PR ¶ 32).  He also contends that Officer Whaley held his right arm behind him for over 30 seconds, which caused a dorsal/thoracic spine sprain for which he is still being treated three years after the incident.  (PR ¶ 29).  According to the plaintiff, while he was on the ground, and after twisting his right arm for approximately 30 seconds, Officer Whaley knelt on the plaintiff and twisted his left arm upwards and backwards throwing him onto his right side.

[6]

(PR ¶ 33).  Officer Whaley then twisted plaintiff's right arm again, throwing him onto the left

side.  (Id.).  According to the defendants, Officer Whaley was frisking Mr. Niles while he was on

the ground.  (DF ¶¶ 32-33).  As Mr. Niles was being frisked, Detective Silva advised everyone in

the store that an armed robbery had just occurred at the Dunkin Donuts.  (DF ¶¶ 33, 34).  While

the defendants state that Detective Silva also advised everyone that the plaintiff met the

description of the possible suspect, the plaintiff denies that this was said, and points out that a

description from anyone who had actually seen the assailant had not yet been broadcast.  (DF

¶ 33; PR ¶ 33).  The entire search took less than one minute: Officer Whaley first made contact

with the plaintiff's arm at 8:40:59 PM, and Mr. Niles was standing on his feet, unassisted, by

8:41:52 PM.  (DF ¶ 36).

Mr. Niles was not placed in handcuffs initially.  (DF ¶ 37).  Instead, he was ordered to

place his hands above his head.  (DF ¶ 39).  Officer Whaley then held the plaintiff's hands on

top of his head while he frisked Mr. Niles again.  (Def. Ex. G).  No weapons were found.  (DF

¶ 35).  According to Mr. Niles, he was led out of the store by several officers, with Officer

Whaley using his left hand to clench the fingers of plaintiff's left and right hands together

behind his head.  (PR ¶ 40; Def. Ex. G).  The plaintiff and the officers left the store at 8:42:29

PM.  (DF ¶ 40).

Meanwhile, Lieutenant Skory had finished interviewing the customers in the bathroom

at the Dunkin Donuts, and he arrived at the Irving Gas Station.  (DF ¶ 41).  According to the

defendants, the witnesses' description of the robbery suspect was very similar to that of the

plaintiff.  (DF ¶ 42).  The plaintiff, however, highlights the differences.  Thus, he argues that he

was not wearing black baggy pants and he was not wearing a hat.  (PR ¶ 42).  He also states that

he was not wearing a gray jacket, but was wearing a black and gray checkered shirt.  (Id.).

Finally, he points out that the witnesses did not specify the armed robber's gender (or race).

(Id.).

Officer Whaley asked the plaintiff if he had any identification on him, and the plaintiff

stated he did not.  (DF ¶ 43).  Officer Whaley also asked the plaintiff where he lived.  (DF ¶ 45).

According to Officer Whaley, the plaintiff stated "380 Salem Street" and pointed east, which

was not in the direction of that address.  (Id.).  According to the plaintiff, however, he stated

"580 Salem Street," which was in the direction in which he pointed.  (PR ¶ 45).

The plaintiff was placed into handcuffs and secured in the rear of Officer Whaley's

cruiser so that he could be brought to the victims at Dunkin Donuts for identification.  (DF

¶¶ 46-47).  Around this time, Lieutenant Reboulet located an employee of the Dunkin Donuts

and began reviewing the available camera footage in order to obtain more information about

what had occurred.  (Reboulet Aff. ¶ 12).  After reviewing the Dunkin Donuts video, Lieutenant

Reboulet arranged to have a description of the actual suspect broadcasted.  (Id.).  The

description included ". . . looks like blue jeans, kind of baggy, black sneakers, bulky gray or black

sweatshirt with a hood."  (PR ¶ 44).[3]  The plaintiff originally asserted that this broadcast was

made by 20:49:52, before he was placed in the police cruiser.  (Id.).  Therefore, he argued that

the officers should have known by that point that he was not the suspect, and should not have

been placed in the vehicle.  (See id.).  At oral argument, however, plaintiff's counsel conceded

---

[3]  According to the dispatcher's notes, "[u]pon reviewing video footage, male got into the passenger-side of a dark blue or black newer model 4 door sedan, with a front plate.  Suspect a B/M, stocky build wearing dark sneakers, baggy jeans, gray hooded sweatshirt.  Black hand gun shown.  B0L0 put out to surrounding communities."  (Def. Ex. B).

that the timing on the different recording devices was not synchronized, so it is unclear as to when, precisely, this broadcast was made.  Nevertheless, it is undisputed that Mr. Niles was not released but, rather, the police requested an ID check from dispatch about Mr. Niles.  (DF ¶ 44; PR ¶ 44).  It is also undisputed that the police did not find any matching records for the plaintiff.  (DF ¶ 44).

According to Mr. Niles, he was very uncomfortable and scared in the police cruiser, and experienced chest pain.  (PR ¶ 46).  He also states that he did not know when or whether he would be released or whether he was going to be held in custody overnight.  (PR ¶ 48).  He did know that he was being held because of the robbery.  (Id.).  He denied any involvement in the robbery.  (DF ¶ 49).

The victims viewed the plaintiff while he was in the police cruiser, and told the police officers that he was not the person who had robbed the Dunkin Donuts.  (DF ¶ 50; PR ¶ 51).  The handcuffs were then removed and the plaintiff was told that he could leave.  (DF ¶ 51).  The plaintiff alleges that the officers detaining him had to be told several times that he was not the right person before his handcuffs were removed.  (PR ¶ 51).  He also contends that the handcuffs left scars and bruises.  (Id.).  While the defendants claim that the officers apologized to the plaintiff, he denies that any apology was ever given.  (DF ¶ 52; PR ¶ 52).

At this point, the plaintiff was irate and accused the police officers of stopping him only because he was black.  (DF ¶ 53; PR ¶ 53).  There were some continued verbal interactions between the plaintiff and the police officers.  (DF ¶¶ 54-56; PR ¶¶ 54-56).  According to the plaintiff, one of the officers said in a belligerent tone, "[w]e are doing our job.  If you don't like it, you can talk to the lieutenant."  (PR ¶ 56).  The officer then waved his hand in a dismissive

manner and walked away, leaving the plaintiff alone in the darkness.  (PR ¶¶ 56, 57).  The

plaintiff left the scene and returned to the Irving Gas Station at 8:59:35PM.  (DF ¶ 59).  He left

the store at 9:04:59 PM.  (DF ¶ 61).  One of the store clerks drove him home.  (DF ¶ 62).

According to the plaintiff, whether it was visible on the video or not, he felt chest pain,

numbness, and was sweating profusely.  (PR ¶ 60).  The pain was radiating all the way up his

neck.  (Id.).  The plaintiff called 911 at 10:49 PM complaining of chest pain.  (PR ¶ 63).

      According to the defendants, the plaintiff did not have any contact whatsoever with

Lieutenant Reboulet on April 21, 2012.  (DF ¶ 58).  The plaintiff contends that he is not sure

which of the officers is Lieutenant Reboulet, and he would need to identify him at trial.  (PR

¶ 58).

      Additional facts will be provided below where appropriate.

### III. <u>ANALYSIS</u>

### A.    <u>Summary Judgment Standard of Review</u>

      By their motion, the defendants are seeking summary judgment on each of the

plaintiff's claims.  "The role of summary judgment is 'to pierce the pleadings and to assess the

proof in order to see whether there is a genuine need for trial.'"  <u>PC Interiors, Ltd. v. J. Tucci

Constr. Co.</u>, 794 F. Supp. 2d 274, 275 (D. Mass. 2011) (quoting <u>Mesnick v. Gen. Elec. Co.</u>, 950

F.2d 816, 822 (1st Cir. 1991)) (additional quotation omitted).  Accordingly, the burden is upon

the moving party to show, based upon the discovery and disclosure materials on file, and any

affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably

be resolved in favor of either party.'"  <u>Vineberg</u>, 548 F.3d at 56 (quoting <u>Garside v. Osco Drug,</u>

Inc., 895 F.2d 46, 48 (1st Cir. 1990)).  "A fact is 'material' only if it possesses the capacity to sway the outcome of the litigation under the applicable law."  Id. (quotations, punctuation and citations omitted).

"Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue."  PC Interiors, Ltd., 794 F. Supp. 2d at 275.  "[T]he nonmoving party 'may not rest upon mere allegation or denials of his pleading[,]'" but must set forth specific facts showing that there is a genuine issue for trial.  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986)).  "The Court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor."  PC Interiors, Ltd., 794 F. Supp. 2d at 275.  "Summary judgment is appropriate if, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law."  Id.  The same standard applies to motions for summary judgment on the grounds of qualified immunity.  See Lopera v. Town of Coventry, 640 F.3d 388, 395 (1st Cir. 2011).  "When a defendant moves for summary judgment on the basis of qualified immunity, the plaintiff bears the burden of showing infringement of a federal right."  Id. at 395-96.

### B.    Standard of Review of a § 1983 Claim

The plaintiff has asserted in Count One that the individual defendants violated his constitutional rights.  While the defendants have broadly defined these claims as alleging

[11]

"unreasonable search and seizure" and "excessive force," the plaintiff claims that he has asserted many more constitutional violations.  Thus, his claims include the following:

    a.    the right of plaintiff to be safe and secure in his person;

    b.    the right of plaintiff not to be deprived of life, liberty, or property without due process of law;

    c.    the right of plaintiff not to be profiled based on his race;

    d.    the right of plaintiff to be free from unreasonable searches or seizures;

    e.    the right of plaintiff to be free from arrest unsupported by probable cause;

    f.    the right of plaintiff to be free from excessive force by the police;

    g.    the right of plaintiff to move about freely, and other rights guaranteed or secured under the United States Constitution.

See Pl. Mem. (Docket 44) at 6.[4]  While the individual rights itemized by the plaintiff may be relevant at the time of trial, as detailed herein, addressing plaintiff's claims of unreasonable search and seizure and excessive force is sufficient for purposes of the motion for summary judgment. The defendants' principal defense is that they are entitled to qualified immunity.

Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." Graham v. Connor, 490 U.S. 386, 393-94,

---

[4]  The plaintiff argues that summary judgment should be denied to the extent that the defendants have not addressed these alleged constitutional rights individually.  This court disagrees.  The defendants acknowledged that the plaintiff has asserted all of these constitutional rights, but contend that they are not all applicable because the plaintiff allegedly was not placed under arrest.  See Def. Mem. (Docket 34) at 4.  As discussed infra, however, this issue does not need to be decided in the context of this motion for summary judgment. Grouping plaintiff's claims into unlawful search and seizure and excessive force is sufficient to cover the key issues in this litigation for present purposes. Moreover, the plaintiff has not argued each of his alleged constitutional claims individually, and it is unclear on the present record whether there are sufficient facts to sustain all of these claims.

109 S. Ct. 1865, 1870, 104 L. Ed.2d 443 (1989) (quotations and citation omitted). "A claim under section 1983 has two essential elements. First, the challenged conduct must be attributable to a person acting under color of state law" and "second, the conduct must have worked a denial of rights secured by the Constitution or by federal law." <u>Soto v. Flores</u>, 103 F.3d 1056, 1061 (1st Cir. 1997). The plaintiff's claims for illegal search and seizure, as well as his claims for excessive force, arise under the Fourth Amendment to the Constitution. <u>See</u> <u>Graham</u>, 490 U.S. at 395, 109 S. Ct. at 1871.  In the instant case, the defendants do not dispute that they were acting under color of state law at the time of the incident. However, they contend that their conduct did not deprive the plaintiff of his constitutional rights, and that even if they acted unlawfully, they are entitled to qualified immunity. For the reasons detailed herein, this court finds that there are disputed issues of material fact which preclude summary judgment for the defendant police officers with respect to the plaintiff's constitutional claims.

### Qualified Immunity

The First Circuit recently described the contours of the qualified immunity defense in detail as follows:

> The rules for granting qualified immunity are well established.  "The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, – U.S. –, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)).  "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'"  *Id.* (quoting *Reichle v. Howards*, – U.S. –, 132 S. Ct. 2088, 2093, 182 L. Ed. 2d 985 (2012)).

> This court adheres to a two-step approach to determine whether a defendant is entitled to qualified immunity: "We ask '(1) whether the facts alleged or shown by the plaintiff make out a violation of a

[13]

constitutional right; and (2) if so, whether the right was "clearly established" at the time of the defendant's alleged violation.'" *Mlodzinski [v. Lewis]*, 648 F.3d [24, 32 (1st Cir. 2011)] (quoting *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir.2009)).  The second prong, in turn, has two elements: "We ask (a) whether the legal contours of the right in question were sufficiently clear that a reasonable officer would have understood that what he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable officer would have understood that his conduct violated the right." *Id.* at 32–33.

Stamps v. Town of Framingham, 813 F.3d 27, 33-34 (1st Cir. 2016) (footnoted omitted).

As the First Circuit has explained further:

The qualified immunity defense "is designed to protect 'all but the plainly incompetent or those who knowingly violate the law.'" *Morse v. Frederick*, 551 U.S. 393, 429, 127 S. Ct. 2618, 168 L. Ed. 2d 290 (2007) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)).  A finding of qualified immunity is warranted if "a reasonable officer could have believed his conduct was lawful." *Olmeda v. Ortíz–Quiñonez*, 434 F.3d 62, 65 (1st Cir.2006).  Such a finding is not warranted if "no reasonable officer could believe" that his conduct was lawful. *Groh v. Ramirez*, 540 U.S. 551, 564, 124 S. Ct. 1284, 157 L. Ed. 2d 1068 (2004).  Put another way, immunity will issue when "officers of reasonable competence could disagree" on the lawfulness of an action, but it will not issue if "it is obvious that no reasonably competent officer would have concluded" that the action was lawful. *Malley*, 475 U.S. at 342, 106 S. Ct. 1092.

This is an objective test; it does not look to the defendants' subjective beliefs concerning the unlawfulness of their conduct. *Philip [v. Cronin]*, 537 F.3d [26, 34 (1st Cir. 2008)].  A "determination of objective reasonableness," however, "'will often require examination of the information possessed' by the defendant officials." *Kelley [v. LaForce]*, 288 F.3d [1, 7 (1st Cir. 2002)] (quoting *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)).

This objective test does not establish that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." *Anderson*, 483 U.S. at 640, 107 S. Ct. 3034.  The Supreme Court has made clear that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002) (citing *United States v. Lanier*, 520 U.S. 259, 117 S. Ct. 1219,

137 L.Ed.2d 432 (1997)).  Nonetheless, unlawfulness must be apparent in light of pre-existing law at the time of the alleged violation.  *Anderson*, 483 U.S. at 640, 107 S. Ct. 3034.  The content of clearly settled law and the belief of a reasonable officer under the circumstances are questions appropriately addressed by courts before trial, where possible.  *See Hunter v. Bryant*, 502 U.S. 224, 227-28, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991); *Cox v. Hainey*, 391 F.3d 25, 29 (1st Cir.2004).

Lopera, 640 F.3d at 396-97.  As detailed below, there are material facts in dispute which preclude the application of qualified immunity to the individual officers' conduct.

    **C.**    **Alleged Fourth Amendment Violations**

**Unlawful Search and Seizure**

The initial inquiry for purposes of the qualified immunity analysis is whether the police had grounds to stop Mr. Niles at the Irving Gas Station store or whether their actions in that regard were unlawful.  "Any detention of an individual by a police officer constitutes a seizure and, to be lawful, must be adequately justified under the Fourth Amendment." United States v. Chaney, 647 F.3d 401, 408 (1st Cir. 2011). "The contours of the showing necessary to satisfy the Fourth Amendment depend on the nature of the detention[.]" Id.  It is not disputed that the "[p]olice may approach citizens in public spaces and ask them questions without triggering the protections of the Fourth Amendment.  Such police engagements need not find a basis in any articulable suspicion." Klaucke v. Daly, 595 F.3d 20, 24 (1st Cir. 2010) (quoting United States v. Young, 105 F.3d 1, 6 (1st Cir. 1997)).  Arrests, on the other hand, "whether formal or de facto, require that the detaining officer have grounds for probable cause, whereas temporary detentions (including investigatory or *Terry* stops, *see Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L. Ed.2d 889 (1968)) may be grounded on a lesser showing equivalent to reasonable suspicion." Chaney, 647 F.3d at 408 (internal quotations omitted).

[15]

In the instant case, the police went beyond questioning Mr. Niles. Rather, they immediately "seized" him by ordering him to the ground at gunpoint.[5]   "Interactions such as this, which involve more intrusive, investigative stops of an individual, fall within the ambit of the familiar *Terry* line of cases." Klaucke, 595 F.3d at 24.   Under this standard, the police "may briefly detain an individual for questioning if the officer has reasonable suspicion supported by articulable facts that criminal activity may be afoot."  Id. (quotations and citations omitted).  In assessing whether a Terry stop is justified, the court undertakes a two-step analysis.  First, the court must determine "whether the officer's action was justified at its inception," and second, the court must determine "whether it was reasonably related in scope to the circumstances which justified the interference in the first place."  Id. (quotations and citations omitted).

To satisfy the first prong, the officers must "point to 'a particularized and objective basis for suspecting the person stopped of criminal activity.'"  Foley v. Kiely, 602 F.3d 28, 32 (1st Cir. 2010) (quoting United States v. Wright, 582 F.3d 199, 205 (1st Cir 2009)).  "[S]uch a finding must be grounded in specific and articulable facts."  Id. (quoting United States v. Espinoza, 490 F.3d 41, 47 (1st Cir. 2007)) (additional quotations and citations omitted).  "The officer making the stop 'must be able to articulate something more than an inchoate and unparticularized suspicion or hunch' linking an individual to criminal activity."  United States v. Woodrum, 202 F.3d 1, 6-7 (1st Cir. 2000) (quoting United States v. Sokolow, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989)) (internal quotation marks omitted).  "The 'objective' component requires

---

[5] "A Fourth Amendment seizure occurs when a police officer 'has in some way restrained the liberty of the citizen 'through physical force or show of authority.'"  United States v. Camacho, 661 F.3d 718, 725 (1st Cir. 2011) (quoting Terry, 392 U.S. at 19 n. 16, 88 S. Ct. 1868) (additional citations omitted)).  There can be no question that pointing a gun at Mr. Niles and ordering him to the ground constituted a seizure for Fourth Amendment purposes.

courts to focus not on what the officer himself believed but, rather, on what a reasonable

officer in his position would have thought."  <u>Foley</u>, 602 F.3d at 32 (quotations and citations

omitted).  While the reasonable suspicion inquiry is an objective one, "inferences made by

police officers based on their experience and expertise" should be afforded "due weight."

<u>Wright</u>, 582 F.3d at 207 (quotations and citation omitted).  Moreover, the officers' actions must

be considered in the "totality of the circumstances," including the events leading up to the

seizure.  <u>See</u> <u>Young v. City of Providence ex rel. Napolitano</u>, 404 F.3d 4, 22 (1st Cir 2005), and

cases cited.

<b><u>The Order to Stop Mr. Niles: Officers Skory and Reboulet</u></b>

As detailed above, the record supports a finding that Lieutentant Skory issued an order

that the man he saw walking down the street be detained as a suspect in an armed robbery.

While Lieutenant Reboulet's involvement in this order is unclear, a logical inference can be

drawn that he was aware of the order and concurred in it since he has attested that he, too,

observed the individual walking down the street and had concerns about him. Based on the

record before this court, a jury can find that Lieutenants Skory and Reboulet did not have a

particularized and objective basis for requesting that Mr. Niles be detained.[6]

The undisputed facts establish that these Officers identified Mr. Niles as a potential

suspect based on nothing more than the fact that he was walking down the street near the

Dunkin Donuts.  The officers have identified nothing in Mr. Niles' actions from which a

---

[6] The defendants have moved for summary judgment on behalf of Lieutenant Reboulet on the grounds that he did not physically touch Mr. Niles. However, it appears that he was involved in or approved of the broadcast which resulted in Mr. Niles' seizure.  As detailed herein, the Court finds that this broadcast could have resulted in a violation of Mr. Niles' constitutional right to remain free from an unlawful seizure.

reasonable officer in their circumstances could have found it likely that he had engaged in criminal activity.  He was not running, he did not have an obvious weapon, and, accepting the plaintiff's facts as true, there were a number of other people in the vicinity. Merely seeing someone walking down the street in the location of a crime does not constitute an objectively reasonable, particularized basis for suspecting an individual of engaging in criminal activity. See United States v. Camacho, 661 F.3d 718, 726 (1st Cir. 2011).

In support of their contention that the stop of Mr. Niles was justified, the defendants argue that Mr. Niles "matched the description from the 911 call."  (See Def. Mem. at 6). However the undisputed facts, as presented by the defendants themselves, establish that there were no details included in the initial 911 call other than the fact that there was a robbery in progress.  (See Reboulet Aff. ¶ 5 "("It was reported that the suspect had a handgun and was threatening to shoot people."); Skory Aff. ¶ 6 "(" Dispatch advised that the suspect had a handgun and had ordered customers to the floor and was threatening to shoot people.")). The defendants also argue that "[t]he witnesses to the armed robbery described a black male wearing a gray jacket."  (Def. Mem. at 6).  However, at the time of the initial broadcast to stop the individual walking down the street, there was no description of any assailant. Moreover, the witnesses never described the assailant as being black. In short, there is evidence from which a jury may find that Lieutenants Skory and Reboulet did not have a "reasonable suspicion supported by articulable facts" that the individual walking down the street near the Dunkin Donuts was involved in criminal activity. See Petro v. Town of West Warwick ex rel. Moore, 770 F. Supp.2d 475, 481 (D.R.I. 2011) (quoting Klaucke, 595 F.3d at 24) (additional citation omitted).

This Court also finds that these officers are not entitled to qualified immunity. The standard for a Terry stop was well established at the time of the incident.  Accepting plaintiff's facts as true and the lack of any facts which linked Mr. Niles to the armed robbery, the record could support a finding that no reasonably competent officer would have concluded that seizing him was lawful.  Under such circumstances, qualified immunity is not appropriate. Id. at 482 (reserving judgment on whether officers are entitled to qualified immunity in light of disputed facts as to whether officers had reasonable suspicion for detaining plaintiff).

### Officers Silva and Whaley

Similarly, there are disputed facts as to whether the actions taken by Detective Silva and Officer Whaley at the Irving Gas Station were reasonable under the circumstances.  According to their statements, these officers had the opportunity to view Mr. Niles through the window before entering the store with guns drawn.  As of this point in time, there was a request by fellow officers to stop an individual for questioning, but nothing more that linked him to the robbery.  Any observation of Mr. Niles through the window would have shown him buying a lottery ticket.  According to the store video, he was not acting in any inappropriate manner. Not only does it seem unlikely that an armed robber would calmly walk out of the store he robbed and enter the neighboring convenience store to buy a lottery ticket, but there also was nothing in Mr. Niles' behavior which would have raised suspicion.  Thus, it is questionable whether these officers' actions in doing more than questioning Mr. Niles, or, at most, patting him down with their guns drawn, was reasonable under the circumstances confronting them at the time.

Assuming that their initial decision to do more than simply approach Mr. Niles for questioning was appropriate, it is questionable whether ordering Mr. Niles to the ground at

gunpoint, and frisking him twice "was reasonably related in scope to the circumstances which

justified the interference" in the first place.  United States v. Young, 105 F.3d at 6.  Mr. Niles

was a 66-year-old man who had not engaged in any obvious improper conduct. Given the

disputed facts in this case, this court cannot conclude as a matter of law that a reasonable

officer would have engaged in the show of force that these officers carried out.  As the cases

recognize, an officer "may have violated the Fourth Amendment if he acted objectively

unreasonably by deciding to make an arrest, by drawing his pistol, or by not reholstering it

before attempting to handcuff the plaintiff." Stamps, 813 F.3d at 37 (quoting Watson v.Bryant,

532 Fed. Appx. 453, 457-58 (5th Cir. 2013)) (internal punctuation omitted).

It is also questionable whether a reasonable officer would have handcuffed Mr. Niles

and put him in the police cruiser. The plaintiff argues that by the time he was handcuffed, the

situation had evolved into a *de facto* arrest which required probable cause. While the use of

drawn guns and handcuffs are among "the most recognizable indicia of a traditional arrest,"

they are not conclusive. Chaney, 647 F.3d at 408 (quotations and citation omitted). See also

United States v. Fornia-Castillo, 408 F.3d 52, 65 (1st Cir. 2005).  As the First Circuit explained in

United States v. Acosta-Colon, 157 F.3d 9 (1st Cir. 1998), "when the government seeks to prove

that an investigatory detention involving the use of handcuffs did not exceed the limits of a

*Terry* stop, it must be able to point to *some* specific fact or circumstance that could have

supported a reasonable belief that the use of such restraints was necessary to carry out the

legitimate purposes of the stop without exposing law enforcement officers, the public, or the

suspect himself to an undue risk of harm." Id. at 18-19 (emphasis in original).  If the police are

unable to "identify *specific* facts or circumstances which could have led the acting law

enforcement officers reasonably to believe that the use of such measures was required to effectuate safely the contemplated investigation[,]" then they have failed to establish that the seizure was constitutionally permissible in the absence of probable cause. Id. at 21 (emphasis in original).  As detailed herein, this court does not need to determine when, if ever, the seizure of Mr. Niles constituted a *de facto* arrest. There are disputed facts which preclude the entry of summary judgment even assuming the lesser, reasonable suspicion, standard applies.

Accepting Mr. Niles' version of facts as true, he appropriately answered all of the police officers' questions about where he was living. Having frisked Mr. Niles twice, the police had not found any weapons. Assuming that Officers Skory had shared the description given by the two women before Mr. Niles was handcuffed, there were obvious inconsistencies between the description and Mr. Niles. Moreover, and again accepting the plaintiff's version of events as true, there is evidence that by the time Mr. Niles was handcuffed, the actual video of the robbery had been reviewed and the suspect clearly did not match Mr. Niles. Even accepting the defendants' argument that they did not need probable cause to handcuff Mr. Niles because he was not under arrest, they have not articulated any specific reason why placing him in handcuffs was necessary for the safety of those involved. Under such circumstances, there is evidence from which a factfinder can conclude that the plaintiff's Fourth Amendment rights were violated. Again, given the well-established principles of Terry and the standard for Fourth Amendment seizures, the disputed material facts preclude the application of the doctrine of qualified immunity with respect to the actions of these officers.

[21]

**Claim of Excessive Force**

The plaintiff further alleges that Officer Whaley should be held liable for the use of excessive force. This also raises factual issues which cannot be decided on the summary judgment record. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham, 490 U.S. at 396, 109 S. Ct. at 1871 (quotations and citations omitted). Thus, the critical question is "whether the defendant officer employed force that was unreasonable under the circumstances." Raiche v. Pietroski, 623 F.3d 30, 36 (1st Cir. 2010) (quotations and citations omitted).  An assessment of "reasonableness" "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396, 109 S. Ct. at 1872.  "Not every push or shove" constitutes a violation of the Fourth Amendment, and the assessment of reasonableness must allow "for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Id. at 396-97, 109 S. Ct. at 1872.

The disputed facts preclude the entry of summary judgment on the plaintiff's excessive force claim.  Although the plaintiff was not doing anything suspicious, Detective Silva pointed his handgun at Mr. Niles and ordered him to the ground. Officer Whaley drew his gun as well. According to the video, Mr. Niles cooperated, and went down on the ground within a reasonable time after being ordered to do so. Nevertheless, and accepting the plaintiff's version of events as true, this 66 year old man was roughly tossed while on the ground by Officer

Whaley, who put his full weight on Mr. Niles' back.  Mr. Niles was then marched out of the store with his hands held together behind his head by the officer, causing him much pain, and was subsequently handcuffed despite the fact that he was complying with the officers' orders. Mr. Niles had already been frisked twice and no weapon was found. Under this scenario described by the plaintiff, Officer Whaley's alleged conduct could be found to "be plainly in excess of the force necessary under the circumstances, and thus excessive under the Fourth Amendment." Young v. Cty. of Los Angeles, 655 F.3d 1156, 1167 (9th Cir. 2011) (internal quotations and citation omitted).  See also Hamilton v. City of Olympia, 687 F. Supp.2d 1231, 1242-43 (W.D. Wash. 2009) (finding that defendants were unable to establish that the use of force was reasonable for purposes of their motion for summary judgment where plaintiff had probably not violated any law, facts presented by plaintiff showed that he posed no immediate threat to the safety of the officers or others, and there was no evidence that the plaintiff was evading arrest).  Moreover, qualified immunity is not appropriate in this case where the parameters of what constitutes excessive force are well established, and it would have been clear to a reasonable officer that using force against Mr. Niles sufficient to cause him permanent or long-lasting physical harm was unreasonably excessive.  See Morelli v. Webster, 552 F.3d 12, 24 (1st Cir. 2009)(denying qualified immunity where the force used was sufficient to tear the rotator cuff of a non-violent person, and defendant's conduct was "outside the universe of protected mistakes" subject to qualified immunity).  Therefore, the defendants' motion for summary judgment as to Count One of the complaint will be denied.

D. **Assault and Battery**

In Count Two of his complaint, the plaintiff alleges that all of the individual defendants are liable for assault and battery. "Assault and battery is the 'intentional and unjustified use of force upon the person of another, however slight, or the intentional doing of a wanton or grossly negligent act causing personal injury to another.'" Sietins v. Joseph, 238 F. Supp.2d 366, 380 (D. Mass. 2003) (quoting Jesionowski v. Beck, 937 F. Supp. 95, 105 (D. Mass. 1996)). Under Massachusetts law, "'an officer authorized to make an arrest may use such force as is reasonably necessary to effect the arrest.'" Id. (quoting Julian v. Randazzo, 380 Mass. 391, 396, 403 N.E.2d 931, 934 (1980)) (punctuation omitted). Where, as here, "a plaintiff alleges both § 1983 excessive force claim and common law claims for assault and battery, [the] determination of reasonableness of the force used under § 1983 controls [the] determination of the reasonableness of the force used under the common law assault and battery claims." Raiche, 623 F.3d at 40.  Because, as detailed above, the relevant facts relating to the use of excessive force against Mr. Niles are in dispute, the motion for summary judgment must be denied with respect to the assault and battery claim against Officer Whaley. Even assuming, arguendo, that qualified immunity is a defense to a state-law assault and battery claim,[7] for the same reason as discussed above Officer Whaley is not entitled to qualified immunity at this stage of the proceedings.

The plaintiff argues that all of the individual defendants are liable for assault and battery under a theory that they acted in concert with the primary actor. Specifically, Mr. Niles relies on

---

[7] "Massachusetts law is unsettled regarding the existence of a state-law concept analogous to federal qualified immunity." Raiche, 623 F.3d at 40.

the Restatement (First) of Torts § 876 (1939), which provides in relevant part that "[f]or harm resulting to a third person from the tortious conduct of another, a person is liable if he . . . (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself. . . ."  See Nelson v. Nason, 343 Mass. 220, 222, 177 N.E. 2d 887, 888 (1961) (under Restatement (First) of Torts § 876(b), driver of second car engaged in a road race on public streets could be liable for death caused when the first car crashed).  Assuming, arguendo, that this principle applies to a claim of assault and battery, the facts do not support the application of this principle in the instant case.  Rather, in the field of torts, this "doctrine appears to be reserved for application to facts which manifest a common plan to commit a tortious act when the participants know of the plan and its purpose and take affirmative steps to encourage the achievement of the result." Stock v. Fife, 13 Mass. App. Ct. 75, 82 n. 10, 430 N.E.2d 845, 849 n. 10 (1982).  Here, however, there is no indication that the other individual defendants actively supported Officer Whaley's use of force in any way.  Moreover, it was not inevitable that in effectuating the seizure of Mr. Niles, Officer Whaley would use excessive force.  Thus, even if the other defendants should have objected to the seizure of Mr. Niles, as the plaintiff alleges, they would not be liable for Officer Whaley's unanticipated assault and battery on Mr. Niles.  For these reasons, summary judgment shall enter in favor of Detective Silva, Lieutenant Skory and Lieutenant Reboulet with respect to Count Two of the complaint.

### E.    False Imprisonment

In Count Three of his complaint, Mr. Niles alleges that all of the individual defendants are liable for false imprisonment. Under Massachusetts law, "[f]alse imprisonment consists of

'(1) intentional and (2) unjustified (3) confinement of a person, (4) directly or indirectly (5) of which the person confined is conscious or is harmed by such confinement.'" Sietins, 238 F. Supp.2d at 381 (quoting Ball v. Wal-Mart, Inc., 102 F. Supp. 2d 44, 55 (D. Mass. 2000)) (additional citation omitted). "Police officers may be liable for this tort unless the police officer had a legal justification for the restraint." Id. (quotations and citations omitted). In the instant case, the existence of disputed material facts preclude the entry of summary judgment on this Count. As detailed above, there is evidence from which a factfinder could conclude that it was unreasonable for the police to request that Mr. Niles be detained since he had done nothing more than walked past the crime scene. Further, as detailed above, there are disputed facts as to whether detention should have continued throughout the incident. For these reasons, the motion for summary judgment as to the false imprisonment claim will be denied.

### F.    Negligence vs. the Town of Wakefield

The plaintiff alleges in Count Four that, in the alternative, the Town of Wakefield should be held liable for the individual defendants' negligence pursuant to Mass. Gen. Laws. ch. 258. However, section 10(c) of that statute specifically excludes from the waiver of public employer immunity in Massachusetts "any claim arising out of an intentional tort, including assault, battery, [and] false imprisonment[.]" Mass. Gen. Laws ch. 258, § 10(c). Given the clear language of the statute, and the fact that the tort claims that the plaintiff has brought are for assault and battery and false imprisonment, summary judgment will enter in favor of the Town on this Count.

In an effort to circumvent the language of the statute, the plaintiff, citing to Adams v. City of Camden, 461 F. Supp. 2d 263 (D.N.J. 2006), argues that the court should inquire into the

defendants' state of mind to determine if their tortious conduct was negligent or intentional.  In

<u>Adams</u>, the court had to determine whether the municipality could be held liable for a false

imprisonment claim brought against police officers under the New Jersey statute waiving

municipal immunity.  However, under the New Jersey statute, the municipality would not be

liable only if the police engaged in conduct "constituting a crime, actual fraud, actual malice, or

willful misconduct[,]" thereby rendering the officer's state of mind relevant.  <u>Id.</u> at 270 (quoting

N.J. Stat. Ann. § 59:2-10).  Under Massachusetts law, in contrast, the Town cannot be held

liable based on claims for assault and battery or false imprisonment.  There is no reason to go

beyond the express language of the statute in order to allow the Town's motion for summary

judgment on this claim.

## IV.     <u>CONCLUSION</u>

For all the reasons detailed herein, the defendants' motion for summary judgment

(Docket No. 33) is ALLOWED IN PART and DENIED IN PART.  Summary judgment shall enter in

favor of defendants Skory, Silva and Reboulet on Count Two (assault and battery) and in favor

of the Town on Count Four (negligence).  The motion for summary judgment is otherwise

denied.

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge